471 F.2d 507
 1973-1 Trade Cases 74,293
 INTERNATIONAL BUSINESS MACHINES CORPORATION, Petitioner-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
INTERNATIONAL BUSINESS MACHINES CORPORATION, Petitioner-Appellant,
v.
Hon. David N. EDELSTEIN, Chief Judge of the United States
District Court for the Southern District of New
York, and United States of America,
Respondents-Appellees.
 Nos. 363, 364, Dockets 72-2106, 72-2107.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 26, 1972.
Decided Dec. 19, 1972.
Rehearing En Banc Granted Feb. 14, 1973.
 
 Frederick A. O. Schwarz, Jr., New York City (Cravath, Swaine & Moore, New York City, of counsel), for petitioner-appellant.
 Howard E. Shapiro, Attorney, Department of Justice, Washington, D. C. (Thomas E. Kauper, Asst. Atty. Gen., Department of Justice, Washington, D. C., of counsel), for respondents-appellees.
 Before MOORE, MULLIGAN and TIMBERS, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 International Business Machines Corporation (IBM) is the defendant in an antitrust[1] action brought by the United States of America (the Government) in the United States District Court for the Southern District of New York (the New York action). Also pending against IBM are a number of private antitrust actions which have been consolidated in the United States District Court for the District of Minnesota before Judge Phillip Neville. These actions may be referred to as Control Data Corp. v. International Business Machines Corp.[2] or, for brevity, the CDC action. The Government is not a party to the actions in Minnesota but has attended various depositions and has received the cooperation of counsel there. In short, it is not a complete stranger to those proceedings.
 
 
 2
 The present appeal and Petition for Extraordinary Writ (28 U.S.C. Sec. 1651; Fed.R.App.P. 21) are addressed to an order in the New York action (Pretrial Order No. 5) made by Chief Judge Edelstein on September 26, 1972, wherein he, after a preamble reciting that IBM "in furnishing to plaintiff, United States of America, microfilm copies of documents in the course of pretrial proceedings * * * excised from the microfilm prior to delivering it to plaintiff copies of documents reproduced on said microfilm which constituted or contained allegedly privileged material, as to which excised documents IBM made the claim that such documents had been delivered to a third party, Control Data Corporation, through inadvertence on its part;" and that the Government "filed a motion in this Court dated April 7, 1972, calling for the production of the materials thus withheld and excised by IBM, plaintiff's ground being that the production of said documents to Control Data Corporation constitutes a waiver of all claims of privilege by IBM as to said documents", entered an order directing that "IBM immediately deliver to plaintiff, in the form provided to Control Data Corporation, a copy of each document withheld and excised by it from the said microfilm, all such documents purportedly being identified and described by Charles M. Waygood, attorney for defendant, in a letter addressed to plaintiff's counsel, dated April 4, 1972, a copy of said letter being attached to and made a part of this order."
 
 
 3
 IBM requests that this Court vacate Pretrial Order No. 5 on the ground that, in producing the documents to Control Data under compulsion of discovery orders issued by the Minnesota district court, which orders expressly protected the right of privilege in the documents, IBM cannot, as the Government argued in its motion below, be held to have waived privilege in the documents in the New York action.
 
 I.
 
 4
 The issues presented in this appeal derive from a decision made by the Government, in effect, to abandon its own, independent discovery program in the New York action and instead to participate in the documentary discovery program already underway between IBM and Control Data in the Minnesota action. Recognizing that "the parties in the [Minnesota] private suit were substantially ahead of us" and that participation in the discovery there would be "of tremendous help to the Government in trying to reach a point of knowledge of its case where it can move ahead as rapidly as we think that it should be moved ahead,"[3] the Government elected to terminate its review of IBM documents and to accept copies of the documents IBM supplied to Control Data. Two alternatives for obtaining microfilm copies of the documents delivered to Control Data were proposed:
 
 
 5
 1. under the first alternative, "IBM would deliver all the documents selected by CDC [Control Data Corporation] (whether or not privileged) and the Government would stipulate that IBM had not waived any privilege claims as to any of the documents";
 
 
 6
 2. under the second alternative, "IBM would first edit from the CDC microfilm [already delivered to CDC] documents for which privilege was claimed, and then supply the Government with a list showing the author, addressee, nature of privilege, date, file source and copyee for every document removed from the microfilm."[4]
 
 
 7
 The parties agreed on the second proposal, an agreement which the Government subsequently challenged on the ground that IBM was acting in bad faith by editing from the microfilm it had delivered to CDC an unreasonable quantity of material before turning it over to the Government. The Government therefore moved Judge Edelstein on April 7, 1972, to order IBM to produce the materials excised and withheld by IBM, arguing that the production of the documents to CDC constituted waiver of all claims of privilege in those documents, and that, because they were now "in the public domain", the documents should be made available to the Government. The granting of the Government's motion is embodied in Pretrial Order No. 5.
 
 
 8
 Since no specific document is before us, we must assume that the contents of the some 1,200 documents in question fall within the attorney-client privilege -a privilege which the courts throughout the centuries have zealously protected.[5] Therefore, if the order in the New York action merely directed IBM in substance to produce all letters between IBM and its attorneys with the explanation that the Court did not believe in the attorney-client privilege and, therefore, chose not to honor it, we might well have before us a situation in which this Court should intervene at this stage to prevent irreparable injury. But this is a hypothesis which, having raised it, we can ignore because undoubtedly Judge Edelstein never would have issued such an order and did not. The practical effect of Pretrial Order No. 5, however, is just as surely to deprive IBM of the right to assert the attorney-client and work-product privileges in the New York action, or to assert the non-waiver thereof. Because Judge Edelstein did not write an opinion to accompany the order, nor make any findings of fact, the rationale underlying his discovery order is not evident.
 
 
 9
 Although the Government is not a party in the Minnesota action, Pretrial Order No. 5 is inextricably tied into that action because the documents in question are indisputably part of "documents [which] had been delivered to a third party, Control Data Corporation, through inadvertence on [IBM's] part" and the order provides that "IBM immediately deliver to [the Government], in the form provided to Control Data Corporation, a copy of each document withheld and excised by it from said microfilm, * * *." The Government does not dispute that the Minnesota district court regulated every facet of IBM's document production to Control Data, including the volume and speed of production (IBM and CDC were placed on an accelerated schedule of document production), the mechanics of IBM's review for privileged documents, and the limitations imposed on Control Data's use of the IBM documents. As already noted, the Government saw many advantages to abandoning its own documentary discovery and to binding itself to the IBM-CDC discovery program, not the least of which was the accelerated schedule imposed by Judge Neville, a schedule which would both facilitate the progress of the New York action as well as avoid duplicative effort and expense.
 
 
 10
 By order of October 19, 1970, Judge Neville accelerated even further the already massive IBM-CDC document inspection program. The magnitude of the program may be evidenced from the fact that IBM itself copied or microfilmed some 80 million CDC documents and that CDC sent a staff of some 61 persons to IBM offices to inspect and copy documents. The strenuous schedule imposed by Judge Neville caused inevitable problems. IBM discovered that, despite its careful pre-examination of documents for privilege, due to the greatly accelerated schedule ordered by Judge Neville, certain privileged documents were inadvertently falling into Control Data's possession. To effect a further screening process, IBM placed a lawyer at the document storage room where CDC was microfilming to make a final inspection of the documents selected by CDC for copying and to withdraw any privileged document before CDC copied same. Control Data in turn complained that this "interceptor", as he was called, seriously impeded the inspection schedule and asked the court to remove him. In the interest of expedition, Judge Neville did remove the interceptor, but on the express condition that he "would thereafter brook no argument that the privilege had been waived [by IBM] merely because the document had been seen by CDC and perhaps copied."[6] Throughout the IBM-CDC discovery program both parties argued that the other side had waived privilege in certain documents, and both alternatively requested of Judge Neville rulings on the question of waiver. The Judge held several hearings and made several rulings, the last of which occurred on April 18, 1972. On that date an order entitled "Order Re Claimed Waiver of Privilege" was entered in the Minnesota action upon motion by IBM "for a definitive ruling on the question of waiver of privilege of documents". The order contained a recital of the various conferences between Court and counsel, and the various orders entered in furtherance of the document inspection program by IBM and CDC-in fact, a quite complete history of the inspection and delivery processes which had been and were being adopted. The Court made clear that in removing IBM's interceptor the Court had specifically conditioned the order by incorporating therein the following provisions:
 
 
 11
 1. Neither IBM nor CDC shall be deemed to have waived the attorney-client or other privilege as to any document which heretofore has, or if reasonable precautions as in the past are taken hereafter may, come into the possession of any party pending litigation, including the case of Greyhound Computer Corporation v. International Business Machines Corporation.
 
 
 12
 2. The determination as to whether a certain document is in fact privileged shall be made by the Master heretofore appointed by this court under the practices and rulings heretofore, or that hereafter may be, established.
 
 
 13
 3. Any document found to be privileged shall not be admissible in evidence at any trial, or hearing nor used in depositions or other discovery proceedings.
 
 
 14
 It was within the context of the just recited background and Minnesota district court orders that the Government agreed to bind itself to the IBM-CDC discovery program, and within which it successfully moved Judge Edelstein below to rule that, by making delivery to Control Data, IBM had waived all privileges in the documents.
 
 
 15
 It is clear to us beyond peradventure that the delivery of the documents pursuant to the Minnesota court order did not constitute a waiver by IBM of its attorney-client or work-product privileges. Of the vast amount of material made available to Control Data and the Government, at issue here are only 1,200 documents. The Government and Judge Edelstein have erroneously, we think, treated the situation as though there has been an uncontroverted waiver of privilege and that the only remaining question is whether the waiver was inadvertent. In our opinion such an approach ignores the real issue, namely, are the documents privileged and was there a knowing and voluntary waiver of the privilege. To our knowledge, these questions have not yet been finally determined and they must be. To resolve the status of each of the 1,200 documents as to privilege, someone having the power to make the determination (a judge or special Master) ultimately will have to rule on that status.
 
 II.
 
 16
 The Government asserts that we lack jurisdiction to entertain either an appeal or a Petition for Extraordinary Writ. At the outset we reject the suggestion that an appeal can properly come before us only if some officer of IBM refuses to deliver the 1,200 documents, subjects himself to the consequences of contempt, and appeals from the contempt judgment.[7] The law today must be more ingenious, flexible and resourceful in its ability to avoid any such old-fashioned and semi-barbaric procedure. See United States v. Hemphill, 369 F.2d 539, 543 (4th Cir. 1966) where the Court said:
 
 
 17
 Despite the comparative promptness with which orders for release on bail or stays may be obtained, that is hardly an appropriate or adequate means for obtaining appellate review of a pre-trial order of dubious validity, or one that was clearly erroneous as we hold this one to have been.
 
 
 18
 See also Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 996-997 (10th Cir.), cert. denied, 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965).[8] The courts have shown themselves to be aware of the inadequacy of a doctrine of: disclose all now-appeal later. As was stated in Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487, 492 (7th Cir. 1970), aff'd mem. by equally divided Court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433, reh. denied, 401 U.S. 950, 91 S.Ct. 917, 28 L.Ed.2d 234 (1971): "[A]ppeal after disclosure of the privileged communication is an inadequate remedy * * *." This principle has for generations supported countless motions to suppress evidence (alleged to have been illegally obtained) because the law recognizes that an appeal from a judgment based upon its use cannot restore the prejudiced party to the position he would have been in had the evidence been excluded.
 
 
 19
 Upon the hypothesis that a blanket order as broad and sweeping as the order before us ought to receive appellate review before IBM is irrevocably deprived of its right to claim the attorney-client privilege, what procedures are available to us? The Government suggests, in effect, that this Court is powerless to protect IBM against a court-compelled violation of the attorney-client privilege. We do not accede to such helplessness. The argument is then proffered that the Expediting Act (15 U.S.C. Sec. 29) here controls and that it provides an appeal only to the Supreme Court. This statute, however, applies only to final judgments.[9] And surely the Supreme Court should not be plagued by anything less. Since Judge Edelstein would not issue the 28 U.S.C. Sec. 1292(b) certificate necessary to prosecute this appeal under Sec. 1292,[10] two roads are open to us-both lead to the same destination (appellate review), namely, 28 U.S.C. Sec. 1291[11] (the so-called Cohen[12] path) and 28 U.S.C. Sec. 1651[13] (the All Writs path). Under the unique circumstances presented by the facts here, in which the discovery order of a district court in this Circuit is in direct conflict with the discovery order of a district court in the Eighth Circuit, and which conflict not only violates the rights of a private party (IBM) but also disrupts the administration of justice in the federal court system, both paths suffice to confer the right of review upon this Court.
 
 Review Under 28 U.S.C. Sec. 1291
 
 20
 In Covey Oil Co. v. Continental Oil Co., supra, the Court stated that "[t]he threshold question of appealability is not to be decided by rote, [footnote omitted] because cognizance must be given to the competing requirements of finality and fairness to the witness." (340 F.2d at 996) In that case a non-party witness was called on to disclose trade secrets. The Court stressed "the right to protection from the disclosure of trade secrets" and noted that "[t]he practical effect of the order will be irreparable by any subsequent appeal." (Id. at 997) Its conclusion was that the order was appealable. However, on the merits the Court allowed the subpoena for the production of documents to stand because the "trade secrets [did] not relate to processes, formulas, or methods but rather to price, cost, and volume of sales of gasoline." (Id. at 999) In contrast to the situation where "[n]o absolute privilege protects the information sought * * * from disclosure in discovery proceedings," (id.), in the IBM case the claim of privilege should be protected before it is lost through judicial error. The party called upon to produce privileged documents is entitled to a judicial determination as to whether any one or more of such documents falls within the "privilege" category. Certainly the Government as an adverse party is not to usurp the functions of a Court in this respect, nor should the district court sanction the usurpation. Furthermore, in Covey Oil, supra, "reasonable protective measures [were] supplied to minimize the effect on the appellants" (id.), even as here Judge Neville's order contains protective provisions.
 
 
 21
 Since Judge Edelstein's order both relates to Judge Neville's order and collaterally frustrates its most important provision, namely, that IBM's right to assert the attorney-client privilege in the documents already delivered to Control Data remains unimpaired, we are faced with a situation that does not fit into the general rule that pretrial discovery orders are not appealable. American Express Warehousing, Ltd. v. Transamerica Ins. Co., 380 F.2d 277, 280-281 (2d Cir. 1967) dealt merely with a more usual question presented by a pretrial discovery order: Did the district court erroneously apply the work-product privilege in ordering disclosure of certain documents? We ruled that this Court lacked jurisdiction to review the order: "We do not think that the mere possibility of erroneous application of the Hickman principle [Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)] to a given set of documents raises a spectre of such dire consequences that immediate appellate review as of right must follow." (Id. 380 F.2d at 281). But here we must rule on a set of facts that does raise the spectre of dire consequences, on a question not contemplated in American Express: Does a district judge in one circuit have the power to attack collaterally the discovery order of a district court in another circuit, upon the ground that production under the protective umbrella constituted a general waiver? Stated differently, the question is, specifically: Did Judge Edelstein abuse his discretion in compelling the production of privileged documents which were expressly protected by the discovery orders of Judge Neville?
 
 
 22
 Under 28 U.S.C. Sec. 1291 an appeal may be taken from any "final" order of a district court. In Gillespie v. United States Steel Corp., 379 U.S. 148, 152-153, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964) the Court held that "the requirement of finality is to be given a 'practical rather than a technical construction"' [citing Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) and Brown Shoe Co. v. United States, 370 U.S. 294, 306, 82 S.Ct. 502, 8 L.Ed.2d 510 (1962)], and that, in deciding the question of finality, the most important considerations are the "inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other [quoting Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511, 70 S.Ct. 322, 94 L.Ed. 299 (1950)]". In ruling that the order appealed from (order striking a cause of action by administratrix and eliminating reference to recovery for certain family members) was "final" for purposes of Sec. 1291, the Court relied on its holding in Cohen, supra, the case which gave rise to the exception to the general rule that interlocutory orders are not appealable. The effect of the "Cohen rule" is to make final, and thus appealable under Sec. 1291, certain orders that do not fully and finally determine the controversy between the parties. Under Cohen the challenged order or ruling must satisfy three criteria: (1) the order must be a final determination of a claim of right "separable from, and collateral to" rights asserted in the main action; (2) the order must be "too important to be denied review"; and (3) review of the order cannot await final judgment on the merits of the main action because "[w]hen that time comes, it will be too late effectively to review the * * * order and the rights conferred * * * will have been lost, probably irreparably." 337 U.S. at 546, 69 S.Ct. at 1225. We believe that this appeal meets all three criteria and hold that IBM's claim on appeal, that in complying with Judge Neville's order to produce the documents to Control Data it did not waive privilege, clearly presents a right "separable from and collateral to" the merits in the Government's antitrust action. Resolution of the question does not depend upon the antitrust laws, as do the issues raised in the main action; and certain it is that Judge Edelstein's order presents a final determination of IBM's rights of privilege in the disputed documents. Moreover, the fact that Judge Edelstein's order is collateral to the main antitrust action under Cohen also means, necessarily, that it is "ancillary" to the main action-a characterization which has led the Supreme Court to rule that a matter is properly reviewable by an appellate court notwithstanding the strictures of the Expediting Act. See Shenandoah Valley Broadcasting, Inc. v. ASCAP, 375 U.S. 39, 40-41, 84 S.Ct. 8, 11 L.Ed.2d 8, modified, 375 U.S. 994, 84 S.Ct. 627, 11 L.Ed.2d 467 (1963), relied upon in Garrett Freightlines, Inc. v. United States, 405 U.S. 1035, 92 S.Ct. 1311, 31 L.Ed.2d 577 (1972), which dismissed the appeal in an antitrust case in which the Government was an active participant (United States v. Navajo Freight Lines, Inc., 339 F.Supp. 554, 555 (D.Colo. 1971)). The Supreme Court's citation of Shenandoah in dismissing Garrett raises the inference that Shenandoah permits a court of appeals review of ancillary matters, without conflict with the Expediting Act, even where the Government is a party to the action. (See note 9, supra.)
 
 
 23
 The recent (December 6, 1972) decision of the Supreme Court in Tidewater Oil Co. v. United States and Phillips Petroleum Co., 409 U.S. 151, 93 S.Ct. 408, 34 L.Ed.2d 375 (U.S. 1972), dealing with an attempted appeal to the Court of Appeals for the Ninth Circuit which was rejected by that Court on the ground that it lacked jurisdiction over an appeal in a government civil antitrust case because of Sec. 2 of the Expediting Act, does not bear upon the problem here presented to us by the appeal or the petition for an Extraordinary Writ. In Tidewater Oil, Tidewater Oil, an original party along with Phillips, sought to be dismissed as a party. The district court denied dismissal but certified under 28 U.S.C. Sec. 1292(b) that a "controlling question of law" existed. The appeal to the Court of Appeals was obviously from an interlocutory order-but it was equally obvious that the order was a part of the main action. After tracing the history of the Expediting Act and stressing the purpose of Congress "to speed appellate review by channeling appeals in Expediting Act cases directly to this Court [Supreme Court] and to avoid the delay inherent in piecemeal appeal by conditioning appeal upon the presence of a 'final judgment' [footnote omitted]" (409 U.S. at 155, 93 S.Ct. at 412), the Court stated that: "Congress was also intent upon facilitating review by this Court 'of a class of antitrust cases deemed particularly important"', and that Congress chose to vest exclusive appellate jurisdiction in the Supreme Court "[b]ecause of the importance of uniform interpretation of the antitrust law," which would "involve issues of wide importance." (409 U.S. at 156, 93 S.Ct. at 412). This underlying rationale is found throughout the opinion, namely, that the Act was designed to limit "review of important questions of antitrust law to this Court." (--- U.S. at ---, 93 S.Ct. at 417); that the "plain and unaltered intent of Congress [was] to require that appeals in government civil antitrust cases be taken only from final judgments and only to this Court"; and that were "any issue determined on interlocutory appeal [it] would normally be open to consideration on final appeal [footnote omitted]" (409 U.S. at 165, 93 S.Ct. at 420). To make its position even stronger, the Court added: "Of course, nothing we say today signifies a retreat from our previous statements that appeals of interlocutory orders in government civil antitrust cases cannot be taken even to this Court." (409 U.S. at 161, 93 S.Ct. at 415 n. 25) (emphasis in original).
 
 
 24
 Taken literally the latter pronouncement would mean that, from the moment a complaint is served in a government civil antitrust action, no party defendant, no subpoenaed witness, no stranger to the proceeding called upon to produce privileged papers, or no attorney sought to be questioned as to confidential advice which he gave his client could enter any court house in the country to seek to prevent the invasion of his most personal constitutional rights or a violation of rights well established by law.
 
 
 25
 We believe that such a reductio ad absurdum result does not emanate from, or is even to be inferred from, the language of the Tidewater Oil decision, the intent of the Court, the wording of the Expediting Act or the intent of Congress.
 
 
 26
 A single practical illustration should suffice. The custodian of the 1,200 allegedly privileged papers in the instant case disregards (with or without advice of counsel) the order to produce. A contempt order of commitment then issues. The jail door closes. The Supreme Court has said that it will review only the final judgment so that it can pass upon important questions of antitrust law. But the order of incarceration has nothing to do with antitrust law. It is entirely ancillary or collateral to the "mainstream" of the antitrust litigation. The victim has no particular interest in the refinements of that field of the law. All that he desires is some court to which he can appeal the unlawfulness of his confinement. We doubt that the Supreme Court would interpret its Tidewater Oil decision as requiring the contemnor to languish in jail for five or more years with the dubiously cheerful knowledge that due process of law eventually would be accorded him when the antitrust appeal would be finally decided.
 
 
 27
 Except for the fact that the order to produce was made by a district judge who has the preparation and ultimate trial of an antitrust case under his supervision, the relief sought here by appeal or by Extraordinary Writ is entirely collateral to the issues in the main case. It is even further removed from the principal action than the situation presented in Cohen was from the main case there. It is for this reason that we say the Expediting Act by language and intent does not bear upon the specific problem now before us. To hold otherwise would be to say that no appellate review is ever available to restrain threatened court action no matter how irreparable the damage flowing therefrom. This we are not prepared to say.
 
 
 28
 If IBM is compelled to obey Judge Edelstein's order, and to forsake the protection provided by Judge Neville's order, the harm thus caused IBM cannot effectively be remedied by an "appeal from the final judgment" under the Expediting Act. We can do no better than repeat the words of the Cohen Court, (337 U.S. at 546, 69 S.Ct. at 1225):
 
 
 29
 When that time comes, it will be too late effectively to review the present order and the rights conferred by the statute [here by Judge Neville's order and the law of privilege] * * * will have been lost, probably irreparably.[14]
 
 
 30
 Unquestionably, 28 U.S.C. Sec. 1291 was designed to permit appellate review in a situation such as here presented, where a litigant has been placed on the horns of a dilemma by the conflicting pretrial orders of two district judges.
 
 Review Under 28 U.S.C. Sec. 1651
 
 31
 This Court heretofore has ruled that "When a discovery question is of extraordinary significance or there is extreme need for reversal of the district court's mandate before the case goes to judgment, there are escape hatches from the finality rule" of 28 U.S.C. Sec. 1291, namely, "a certification by the district court under 28 U.S.C. Sec. 1292(b), * * * or an extraordinary writ" under 28 U.S.C. Sec. 1651.[15] American Express, supra, 380 F.2d at 282. In American Express we noted that the touchstones for review by mandamus, as enunciated by the Supreme Court in Schlagenhauf v. Holder, 379 U.S. 104, 110-111, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), are (1) usurpation of power by the district court, (2) clear abuse of discretion by the district court, or (3) the presence of an issue of first impression.[16] Other courts have similarly observed that, in the discretion of the appellate court, mandamus should lie only in exceptional circumstances, where the writ will aid the court's jurisdiction, or where immediate review is necessary for "proper judicial administration in the federal system." La Buy v. Howes Leather Co., 352 U.S. 249, 259-260, 77 S.Ct. 309, 315, 1 L.Ed.2d 290 (1957). See also Will v. United States, 389 U.S. 90, 108, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967) (Black, J., concurring); 9 J. Moore, Federal Practice, p110.26 (2d ed. 1970). Although as a general rule ordinary discovery orders are not, and should not be, appealable, occasionally there arises a discovery question presenting a question of law capable of general resolution; under such circumstances appellate review by supervisory mandamus provides a logical method by which to supervise the administration of justice within the Circuit. We think the facts here presented fit squarely into that category of situations. Unless we review immediately Judge Edelstein's order not only will IBM's rights be irreparably harmed in the New York action, the order may well disrupt the proceedings in the Minnesota action by destroying privilege in documents which the Minnesota court expressly held to be privileged.
 
 
 32
 Wherein lies Judge Edelstein's "clear abuse of discretion" or "usurpation of power"? Pretrial Order No. 5 seemingly rests on the supposition that IBM waived its right to invoke privilege in the New York action when it delivered the disputed documents to Control Data in the Minnesota proceedings. Such a supposition clearly ignores the protective provisions of Judge Neville's "Order Re Claimed Waiver of Privilege", supra, as well as the intent underlying the contractual agreement between IBM and the Government, supra. When the parties agreed to adopt the "second alternative" by which IBM would supply the Government with documents, and when the parties so agreed in light of the Neville order's protective provisions, it seems to us crystal clear that IBM intended to confer upon the Government rights in the documents no greater than those conferred on Control Data by the Neville order. Insofar as (1) the Edelstein order is in direct conflict with the provisions of the Neville order, (2) the Edelstein order is based on the erroneous assumption that waiver occurred by IBM delivery to CDC, and (3) the Edelstein order has ignored the intent of the IBM-Government agreement, we hold that Pretrial Order No. 5 constitutes a clear abuse of discretion requiring immediate review by extraordinary writ.
 
 
 33
 In United States v. Hemphill, supra, where the Court concluded that petition for mandamus was an appropriate remedy to review an order to show cause why the Secretary of Labor should not be held in contempt, it was stated:
 
 
 34
 When a pretrial order is clearly erroneous, an appellate corrective ought to be available if compliance with the order would work a substantial and irreparable deprivation or if the only alternative is submission to a contempt order.
 
 
 35
 Clearly, mandamus is an appropriate means of reviewing the discovery order before us, and of applying an "appellate corrective" to prevent compelled disclosure of privileged documents. The cases so holding are numerous;[17] we point only to a recent representative of the line, Harper & Row Publishers, Inc. v. Decker, supra, 423 F.2d at 492, where the Court, in granting a mandamus compelling the district court to vacate an order permitting plaintiffs to obtain privileged material, noted that the extraordinary remedy of mandamus was appropriate "because maintenance of the attorney-client privilege up to its proper limits has substantial importance to the administration of justice, and because an appeal after disclosure of the privileged communication is an inadequate remedy * * *" (emphasis added). We agree.
 
 
 36
 Therefore, in our opinion, the two paths converge at a common destination, i.e., appellate review of Pretrial Order No. 5 at this stage of the New York proceedings. Accordingly, we vacate Pretrial Order No. 5 and direct that, with respect to the documents which IBM excised from the microfilm delivered to Control Data, and withheld from the Government in the New York action, said documents containing allegedly privileged material, a new discovery order be entered which provides for a judicial determination of the privileged nature of the documents and for the delivery thereafter to the Government of any documents determined not to be privileged.
 
 MULLIGAN, Circuit Judge (dissenting):
 I. THE EXPEDITING ACT (15 U.S.C. Sec. 29)
 
 37
 I respectfully dissent. I believe that we are ousted of jurisdiction to hear this appeal by the Expediting Act, 15 U.S.C. Sec. 29 (1970). This statute, by its terms, limits appeals in Government initiated civil anti-trust actions only to the Supreme Court, from the final judgment of the district court. While I agree with the majority that this is not "the final judgment," it does not follow that appeals from interlocutory orders in such cases are appealable to the Court of Appeals. On the contrary, Mr. Justice Brandeis noted in United States v. California Coop. Canneries, 279 U.S. 553, 558, 49 S.Ct. 423, 425, 73 L.Ed. 838 (1929), that the Expediting Act "precluded the possibility of an appeal to either court from an interlocutory decree." While this may have been dictum, it has been followed in subsequent decisions of that Court and Circuit Courts ever since.[1]
 
 
 38
 The only possible escape provided by Congress from the Expediting Act was in the Interlocutory Appeals Act of 1958 which allows an appeal from an interlocutory order in section 1292(b) if the district judge is of the opinion that the order involves "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. . . ." The escape is not available here. Chief Judge Edelstein has declined to certify that a controlling question of law is involved. There is authority for his position.[2] Even if he had certified, the recent decision of the Supreme Court in Tidewater Oil Co. v. United States, 409 U.S. 151, 173, 93 S.Ct. 408, 421, 34 L.Ed. 2d 375. (U.S.1972), squarely holds: "Hence, we conclude that Sec. 1292(b) did not establish jurisdiction in the Court of Appeals over interlocutory orders in Expenditing Act cases. The exclusive nature of the jurisdiction created in Sec. 2 of the Expediting Act has consistently been recognized by this Court, and we hold today that that exclusivity remains unimpaired." (Emphasis added).
 
 
 39
 The majority seeks to avoid the Supreme Court rejection of jurisdiction in the Court of Appeals in these cases, by arguing that the interlocutory order here has no special anti-trust significance. I cannot interpret Tidewater to allow the Court of Appeals, even where a Sec. 1292 (b) certificate has been issued, to deter mine in its discretion whether the interlocutory order has substantial, insubstantial or no anti-trust significance. The Court (409 U.S. at 168, n. 43, 93 S.Ct. at 419, 420, n. 43) plainly indicates that the Act was intended to preserve to the Supreme Court alone the right to review all interlocutory orders and then only when there is an appeal from the final judgment. Piecemeal appeal was sought to be eliminated and there is no suggestion that our Court act to screen appeals on the basis of our determination as to their trade regulatory significance.
 
 
 40
 As the opinion points out (409 U.S. at 169, 93 S.Ct. at 419). Chief Justice Burger had already voiced criticism of the wisdom of the statute since some antitrust questions are no longer so novel or so unsettled that they require direct review by the Supreme Court. However, the Court did not at all indicate that this function of screening by intermediate appeal be therefore relegated to the Courts of Appeals. Rather the Court held: "Yet, despite all of these criticisms, our personal views as to the wisdom of Sec. 2 are, of course, no basis for disregarding what we are bound to recognize as the plain and unaltered intent of Congress to require that appeals in government civil antitrust cases be taken only from final judgments and only to this Court." (409 U.S. at 170, 93 S.Ct. at 419). Therefore, I see no basis in the Act of Congress or in the holdings of the Supreme Court which bind us here, to engraft an exception based upon the character of the order. So long as it is interlocutory, and that cannot be disputed, we can have nothing to do with it. It must languish in Purgatory until the Day of Final Judgment.[3]
 
 
 41
 It is true that even though the Government may have initiated a civil anti-trust action, if a dispute arises entirely between private parties and does not concern the Government, then the Expediting Act has been held not to bar an appeal to the Court of Appeals. Shenandoah Valley Broadcasting, Inc. v. ASCAP, 375 U.S. 39, 40, 84 S.Ct. 8, 11 L.Ed. 2d 8 (1963); Standard Fruit & S.S. Co. v. United Fruit Co., 393 U.S. 406, 89 S.Ct. 684, 21 L.Ed.2d 634 (1969) (per curiam-see United States v. United Fruit Co., 410 F.2d 553 (5th Cir.), cert. denied, 396 U.S. 820, 90 S.Ct. 59, 24 L.Ed.2d 71 (1969)); United States v. ASCAP, 341 F.2d 1003, 1007 (2d Cir.), cert. denied, 382 U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965). This recognized application of the Expediting Act was recently followed by the Supreme Court in Garrett Freightlines, Inc. v. United States, 405 U.S. 1035, 92 S.Ct. 1311, 31 L.Ed.2d 577 (1972). In that case, although the United States had commenced a civil anti-trust action (United States v. Navajo Freightlines, Inc., 339 F.Supp. 554 (D.Col.1972)), the district court dismissed on the ground that the Interstate Commerce Commission had primary jurisdiction. The United States did not appeal, but Garrett Freightlines, a named defendant in the district court but allied with the Government as an alleged unwilling victim of Navajo, took a direct appeal to the Supreme Court. The dismissal by the Court simply cited the Shenandoah case. The citation can only mean that the Court reasoned that since the Government no longer considered itself aggrieved, the dispute was between private parties and hence an appeal lay to the Court of Appeals. The Shenandoah rule is not applicable here of course since this dispute below and on appeal continues to be between the United States and IBM. Since we have no jurisdiction at all here by virtue of the Supreme Court's interpretation of the Expediting Act, I would think that the twin paths to appeal taken by the majority (Cohen and mandamus) are off limits. If not, they lead us only into the Serbonian Bog and not to any grounds for appeal.
 
 II. THE COHEN EXCEPTION
 
 42
 In Cohen v. Beneficial Indus. Loan Co., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949), the Supreme Court indicated that an exception to the finality of judgment condition for appeal could be found "in that small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." This court has squarely held that a discovery order is not appealable under the Cohen rule. American Express Warehousing, Ltd. v. Transamerica Ins. Co., 380 F.2d 277 (1967). The discovery order in that so-called "big case" involved a determination by the district court that the questioned documents were not within the attorney's work-product concept. Judge Feinberg wrote an exhaustive opinion vindicating the policy of nonappealability of discovery orders, citing cases both pre and post-Cohen. The majority seems to consider American Express as a rather routine dismissal of an appeal from a pre-trial discovery order. The present appeal is characterized as one which raises the spectre of such dire consequences that immediate review is mandated.
 
 
 43
 The horrendous consequences of Judge Edelstein's Pre-Trial Order No. 5 compelling the production of IBM documents presumably privileged before disclosure to CDC, are not readily apparent. It is urged that it is in direct conflict with the discovery order of Judge Philip Neville of the Federal District Court for the District of Minnesota which protected those of the 1200 documents which a Special Master of that court may find privileged, from the claim of waiver of privilege by the court ordered production to CDC. Judge Neville has several private civil anti-trust actions before him which were brought against IBM charging section 2 Sherman Act violations. These actions have been consolidated in that court under the Multidistrict Litigation Act (28 U.S.C. Sec. 1407 (1970)) but this Act does not apply to the anti-trust action brought by the United States in the Southern District of New York and assigned to Chief Judge Edelstein. 28 U.S.C. Sec. 1407(g) (1970). Since the United States is not a party to the Minnesota District actions and did not appear in any of the pretrial discovery hearings, it is not bound by them. Judge Edelstein should not be bound either. The only disruption of the administration of justice in the federal court system that will occur is a majority ruling here subjecting the United States and the Chief Judge of the Southern District to the discovery orders of another district judge (and a Special Master) who is responsible for conducting private anti-trust litigation there and who has no jurisdiction here. The suggestion that if the documents are made available here to the Government they will then eventually become available to CDC cannot be gainsaid. However, the admissibility of such documents in evidence in Minnesota would be obviously a question to be decided by Judge Neville. Whatever collateral value their inspection and examination might provide for CDC has already been achieved by the initial surrender by IBM.
 
 
 44
 We do not consider this case unique because IBM has been "irrevocably" deprived by Pre-Trial Order No. 5 of its right to claim the attorney-client privilege. This is surely the effect of every pre-trial discovery order denying privilege as it was in American Express. If the Supreme Court ultimately determines that the privilege was not waived by disclosure to CDC and if any judgment of relief against IBM is based upon these documents, then the Court could reverse or modify or remand the judgment. How damning or conclusive these 1200 documents representing .0003% of those already surrendered may be, is purely speculative at this point.
 
 
 45
 The reliance of the majority on Covey Oil Co. v. Continental Oil Co., 340 F.2d 993 (10th Cir.), cert. denied, 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965) is misplaced. There a non-party witness was ordered to disclose material which it claimed constituted a trade secret. The Court indicated that the disclosure of a true trade secret would create an irrevocable loss and it is obvious that a non-party would have no independent right of appeal. While the sanctity of the privilege cannot be denied, the inspection here if improper is not necessarily irretrievable. On argument counsel only indicated that it would create a change in pre-trial and trial tactics.
 
 
 46
 Chief Judge Friendly in Weight Watchers, Inc. v. Weight Watchers Int'l, Inc., 455 F.2d 770, 773 (2d Cir. 1972), warned: "We have often indicated that Cohen must be kept within narrow bounds, lest this exception swallow the salutary 'final judgment' rule. (Citing cases)." He further noted that an important factor bearing on the application of Cohen, is whether a decision will settle a point once and for all, or will it open a flood of appeals concerning the propriety of a district court's ruling. 455 F.2d at 773. Cohen did settle a collateral issue finally by upholding in a diversity action, the constitutionality and applicability of a New Jersey statute which provided that in a stockholder derivative action an unsuccessful plaintiff is liable for litigation expenses and is obligated to post a bond before commencing such action if his stockholderings fall below the statutory minimum. No such wide ranging issue is to be finally decided here. The alleged collateral attack on the Minnesota court's discovery order does not exist and even if it did the particular circumstances here are such that no "once and for all" ruling is discernible. The underlying question of whether there is merit to the claim of inadvertent waiver does not surface in the majority opinion here. The decision is rather premised on the theory that Judge Neville's holding accepting the IBM argument is binding on the Government. Moreover, Judge Neville's order of April 28, 1972 states: "Inadvertence becomes of course a fact question and differs in each case." Control Data Corp. v. IBM, Doc. No. 3-68 Civ. 312, at 6 (D.Minn.). Thus the "flood of appeals" questioning the propriety of district court rulings suggested by Judge Friendly is all that this assertion of appellate jurisdiction can spawn. While Judge Edelstein did not write an opinion below, he did caution against the opening of a Pandora's box which would result if the inadvertent waiver doctrine were here countenanced. This was not as Delphic a pronouncement as it might first appear. He later referred to the "second bite of the apple" which could be urged in all cases where on second thought a party might conclude that a document was really privileged and the privilege, though normally lost or waived by surrender, was not deliberate or consciously waived because of a mistake. This would inundate the trial court as well as the appellate court with collateral litigation which would create intolerable delay.
 
 III. MANDAMUS
 
 47
 As pointed out in part I of this opinion, the Expediting Act here precludes our taking this appeal. It therefore follows that not having jurisdiction, we cannot evade this controlling statute by recourse to the All-Writs Act, 28 U.S.C. Sec. 1651. This proposition has been established by the United States Supreme Court in United States Alkali Export Ass'n v. United States, 325 U.S. 196, 203, 65 S.Ct. 1120, 1125, 89 L.Ed. 1554 (1945), itself an attempt to have an interlocutory order in a Government antitrust case reviewed.
 
 
 48
 The writs may not be used as a substitute for an authorized appeal; and where, as here, the statutory scheme permits appellate review of interlocutory orders only on appeal from the final judgment, review by certiorari or other extraordinary writ is not permissible in the face of the plain indication of the legislative purpose to avoid piecemeal reviews.
 
 
 49
 The Alkali Export Ass'n holding has been recently reaffirmed by the Supreme Court in the Tidewater opinion. 409 U.S. at 161 n. 25, 93 S.Ct. at 415, n. 25. The Court further noted: "application for the extraordinary writ must be made to this Court where 'sole appellate jurisdiction lies' in such cases." 409 U.S. at 160, 93 S.Ct. at 414.
 
 
 50
 Even if we were not bound by the Expediting Act, I fail to see such egregious conduct as usurpation of power or a clear abuse of discretion (Schlagenhauf v. Holder, 379 U.S. 104, 110-111, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964)) so as to justify the granting of extraordinary relief. The issuance of an order directing disclosure is clearly within the power of the district court under Fed. R.Civ.P. 37. Since the matter is properly pending before the district judge, his refusal to accept the inadvertent waiver position adopted in another case by another judge, cannot reasonably be characterized as a usurpation of power.[4] Nor do we consider it to be a clear abuse of discretion. The record does not warrant the assumption that IBM withdrew its interceptor only because of Judge Neville's assurance that he would "brook no argument" thereafter that the privilege had been waived merely because the document had been seen by CDC and perhaps copied. That assurance was only forthcoming in his order of April 18, 1972 on the motion of IBM which order was made some 11 days after the motion of the United States in the Southern District of New York to compel disclosure of the 1200 questioned documents. It would seem reasonable to assume that all of these documents had been already made available to CDC prior to this determination. Judge Neville's prior ruling was contrary and his initial attitude unclear. His first indication of a position was in an in-chambers hearing on November 2, 1970. While his intent then may well have been to protect both CDC and IBM against inadvertent waivers by production of documents according to a time schedule he had set, his order of April 18th, 1972 candidly admits that his November, 1970 position was not "crystal clear" and counsel to IBM has admitted in an affidavit that the Judge made no explicit ruling.[5] His next ruling on April 21, 1971 was clear. He refused to countenance the defense of inadvertent waiver. He again frankly states in his order of April 18, 1972 this ruling was "both erroneous and inadequate in scope."[6] It is significant that both CDC and IBM each claimed that privileged documents had been mistakenly revealed and that the Judge wished to deal evenhandedly with both claims (a factor not present in the Southern District proceeding). In any event his rulings are not questioned here nor does it appear that he ever contemplated that they would be held applicable to the United States in a wholly separate proceeding in another federal judicial district. In view of the admitted vacillation and obscurity of Judge Neville's prior rulings, we cannot accept the majority's stance that IBM was gulled into a delivery of privileged material with an assurance of judicial protection.
 
 
 51
 The final question we reach is whether Judge Edelstein abused his discretion by disregarding an agreement between the Government and IBM that limited discovery inter sese to those documents delivered by IBM to CDC concerning which no question of privilege was raised. The agreement is claimed to be based on telephone calls between respective counsel in December, 1970, which culminated in a letter from IBM counsel to counsel for the United States Department of Justice on December 28, 1970 to the effect that the sense of their under-standing was that IBM would only deliver a copy of the microfilm taken by CDC with the excision of any inadvertently produced privileged documents. Since this letter was not answered, it is obvious that the Government elected this option and refused an alternative suggestion that the entire and unedited microfilm be supplied with the Government stipulating that IBM had not waived its privilege. The parties now draw conflicting inferences from the alternative selection made by the Government. IBM contends that this clearly indicates that the Government had waived its right to view the excised material. The Government argues that it had refused to stipulate to any IBM non-waiver by rejecting the first alternative and in accepting the second it had certainly not agreed to concede privilege despite delivery.
 
 
 52
 It is perhaps instructive to note that IBM which now claims clear contractual protection never raised the December, 1970 agreement in the May 12, 1972 hearing before Judge Edelstein but only raised the issue on September 26, 1972 after his adverse ruling of September 12, 1972. While counsel urges that this was inadvertent and we do not question this, if the agreement was as clearly decisive of the issue as is now asserted, it is difficult to understand how it could be overlooked. In any event the letter does not explicitly or by implication in our view support the proposition that the United States here agreed to be bound by the rulings of a tribunal in which it was not a party and had not appeared. Certainly the United States had no right to the excised material under its agreement but we see no waiver of its rights to seek the data in question by court order in New York. It has done so and the court below has ruled in its favor.
 
 
 53
 The appellant here has urged that the amount of material it has been required to produce within the time limitations set by the Minnesota court is so gigantic that error was inevitable. It is indeed mind-boggling to contemplate 17 million document pages which in bulk weigh 87 tons and would stretch from coast to coast. Even with the sophistication and expertise which this appellant brings to the task of document production, to say nothing of the legal forces it commands, error is inevitable, we agree. Monopolist or not, IBM is hardly infallible. That fact, however, does not answer the question, upon whom should the risk of its error fall. Judge Edelstein is charged with the responsibility of conducting this litigation which is not only complex but has national economic significance. His decision here on pre-trial discovery in view of the procedural and substantive complexities yet to be faced in the management of this monstrous litigation, in my view, is clearly within the scope of his discretion. But it is not appealable in any event and by no means can it be characterized as a usurpation of power which should prompt this court to intervene by the extraordinary writ of mandamus. I would leave it alone.
 
 
 
 [1]
 This term is here used colloquially. Reference to the complaint must be had to ascertain the issues presented. The issues in the principal antitrust action are not material to the questions raised in this appeal
 
 
 [2]
 3-68 Civ. 312 (D.Minn.)
 
 
 [3]
 Transcript, Hearing before Judge Edelstein, September 12, 1972, at 10
 
 
 [4]
 Government Brief, p. 28, IBM Brief, p. 25. By providing this information as to the documents withheld, IBM would be able to identify, and substantiate its claim of privilege in, any document disputed by the Government
 
 
 [5]
 Radiant Burners, Inc. v. American Gas Ass'n, 320 F.2d 314, 322-323 (7th Cir.), cert. denied, 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963). See generally, Comment, Corporations and the Attorney-Client Privilege, 12 B.C.Ind. & Com.L. Rev. 1200 (1971) and Weinschel, Corporate Employee Interviews and the Attorney-Client Privilege, 12 B.C.Ind. & Com.L.Rev. 873 (1971)
 
 
 [6]
 Order Re Claimed Waiver of Privilege, Control Data Corporation v. IBM, 3-68 Civ. 312 (D.Minn.), April 18, 1972, at 2-3
 
 
 [7]
 Alexander v. United States, 201 U.S. 117. 121, 26 S.Ct. 356, 50 L.Ed. 686 (1906). See 9 J. Moore, Federal Practice, p 110.13, at 153-54 (2d ed. 1970), Guilford Nat'l Bank of Greensboro v. Southern Ry., 297 F.2d 921 (4th Cir. 1962), cert. denied, 375 U.S. 985, 84 S.Ct. 518, 11 L.Ed.2d 473 (1964) and Hanley v. James McHugh Constr. Co., 419 F.2d 955 (7th Cir. 1969)
 
 
 [8]
 The Court there stated: "We are not impressed with the argument * * * that the appellants may obtain review by disobedience of the order and appeal from a subsequent adjudication of contempt. These non-party witnesses should not be required to expose themselves to the hazard of punishment in order to obtain a determination of their claimed rights." It is noteworthy that courts of late have sought to circumvent the general rule that discovery orders are non-appealable by a too ready use of the serious judicial weapon of criminal contempt. See Guilford Nat'l Bank of Greensboro v. Southern Ry., supra, and Hanely v. James McHugh Constr. Co., supra, where parties refusing to produce documents were adjudged guilty of criminal contempt and ordered to pay trivial fines, from which judgments appeal was thus made possible
 
 
 [9]
 15 U.S.C. Sec. 29 provides that
 In every civil action brought in any district court of the United States under any of said [antitrust] Acts, wherein the United States is complainant, an appeal from the final judgment of the district court will lie only to the Supreme Court.
 
 
 [10]
 Before a district court may certify a "controlling question of law" for interlocutory appeal under 28 U.S.C. Sec. 1292 (b), he must find that "an immediate appeal * * * may materially advance the ultimate termination of the litigation * * *."
 
 
 [11]
 28 U.S.C. Sec. 1291 provides that
 The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States * * * except where a direct review may be had in the Supreme Court.
 
 
 [12]
 Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)
 
 
 [13]
 28 U.S.C. Sec. 1651 provides that
 (a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.
 
 
 [14]
 See Developments in the Law-Discovery, 74 Harv.L.Rev. 940, 1000 (1961) where the author states: "[W]hen there is an order compelling discovery the interest which would be violated by disclosure is separable from all elements of the cause of action or the defense, and the question whether that interest has been violated will be moot on appeal from a final judgment." See also American Oil Co. v. McMullin, 433 F.2d 1091 (10th Cir. 1970) where an order quashing writs of attachment and garnishment was held appealable under Cohen, inasmuch as the liens were not at issue in the principal action; and Overby v. United States Fidelity & Guar. Co., 224 F.2d 158 (5th Cir. 1955), where appellate review was given to an order directing the production of bank examination reports allegedly the subject of executive privilege, the appeal brought by a non-party, the Acting Secretary of the Treasury. See also Republic Gear Co. v. Borg-Warner Corp., 381 F.2d 551 (2d Cir. 1967)
 
 
 [15]
 See n. 13, supra
 
 
 [16]
 See Grace Lines, Inc. v. Motley, 439 F.2d 1028, 1031, 1034 (2d Cir. 1971) where we held mandamus proper to review a district court order declaring mistrial and retrial and to order a reinstatement of the jury verdict with judgment to be entered thereon. Mandamus was appropriate because the district court had clearly abused its discretion, committing "egregious error" in declaring a mistrial. The justification for mandamus there bears repeating here:
 * * * This is not to say that supervisory mandamus is intended, or can be used, to authorize the indiscriminate use of prerogative writs as a medium for reviewing interlocutory orders. Mandamus will lie, in the sound discretion of the appellate court, where the trial court has exceeded or wrongfully refused to exercise its judicial power or has committed a clear abuse of discretion. [citations omitted] Only in such cases does the desirability of present review outweigh the policies which confine appeals to the review of final orders. [citation omitted] 439 F.2d at 1031 n. 2.
 
 
 [17]
 See, for example, Overby v. United States Fidelity & Guar. Co., supra, (order directing the production of bank examination reports allegedly protected by executive privilege); Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) (order compelling defendant to submit to physical examination); Investment Properties Int'l, Ltd. v. IOS, Ltd., 459 F.2d 705 (2d Cir. 1972) (order vacating a notice of deposition); Madison-Lewis, Inc. v. MacMahon, 299 F.2d 256 (2d Cir. 1962) (order opening files to review by the United States); Pfizer, Inc. v. Lord, 456 F.2d 545, 548 (8th Cir.) cert. denied, 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972) (order compelling production of documents for which attorney-client privilege claimed); United States v. Hemphill, 369 F.2d 539 (4th Cir. 1966) (order compelling identification of informers); Continental Oil Co. v. United States, 330 F.2d 347 (9th Cir. 1964) (order requiring production of documents for which attorney-client privilege was claimed); Hartley Pen Co. v. United States District Court, 287 F.2d 324 (9th Cir. 1961) (order requiring disclosure of trade secrets)
 
 
 [1]
 See Tidewater Oil Co. v. United States, 409 U.S. 151, 93 S.Ct. 408, 34 L.Ed.2d 375 (U.S.1972); Brown Shoe Co. v. United States, 370 U.S. 294, 305 n. 9, 82 S.Ct. 502, 8 L.Ed.2d 510 (1962); the cases so holding are listed in the exhaustive opinion of the First Circuit in United States v. Cities Service Co., 410 F.2d 662, 665 n. 5 (1969). Other cases are noted in Annot., 10 A.L.R. Fed. 603, 621-624 (1972)
 
 
 [2]
 Atlantic City Electric Co. v. General Electric Co., 337 F.2d 844 (2d Cir. 1964). In his dissenting opinion in American Express Warehousing, Ltd. v. Transamerica Ins. Co., 380 F.2d 277, 285 n. 2 (2d Cir. 1967), Chief Judge Lumbard commented: "An order granting or denying discovery could rarely, if ever, satisfy this requirement," i. e., that an immediate appeal would materially advance the conduct of the litigation
 
 
 [3]
 The argument of the majority that a contemnor might remain in durance vile for many years until final judgment is in any event the law now with respect to a party who is held in civil contempt in any case whether the Expediting Act applies or not. Fox v. Capital Co., 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67 (1936); Fireman's Fund Ins. Co. v. Myers, 439 F.2d 834 (3d Cir. 1971); Comptone Co. v. Rayex Corp., 251 F.2d 487 (2d Cir. 1958)
 
 
 [4]
 As this Court recently pointed out in United States v. DiStefano, 464 F.2d 845, 850 (1972), where the district judge has the power to make a determination under the Federal Rules,
 Will v. United States, 389 U.S. 90, 95, 104 [, 88 S.Ct. 269, 273, 278, 19 L.Ed. 2d 305 (1967)] (1967), makes plain that mere error, even gross error in a particular case, as distinguished from a calculated and repeated disregard of governing rules, does not suffice to support issuance of the writ. "While the courts have never confined themselves to an arbitrary and technical definition of 'jurisdiction,' it is clear that only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy . . . Mandamus, it must be remembered, does not 'run the gauntlet of reversible errors.' Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 382 [, 74 S.Ct. 145, 147, 98 L.Ed. 106 (1953)] (1953). Its office is not to 'control the decision of the trial court,' but rather merely to confine the lower court to the sphere of its discretionary power. Id., at 383 [, 74 S.Ct. 148]." . . . The Court had said long before that the all-writs statute, 28 U.S.C. Sec. 1651(a), cannot "be availed of to correct a mere error in the exercise of conceded judicial power," but can be used only "when a court has no judicial power to do what it purports to do-when its action is not mere error but usurpation of power . . ." De Beers Consolidated Mines, Ltd. v. United States, 325 U.S. 212, 217 [, 65 S.Ct. 1130, 1133, 89 L.Ed. 1566 (1945)] (1945).
 
 
 [5]
 Control Data Corp. v. IBM, Doc. No. 3-68 Civ. 312, at 3 (D.Minn. April 18, 1972) and Affidavit of IBM Counsel, at 12, p 19 (dated October 23, 1971), Control Data Corp. v. IBM, supra, admitting that while no explicit ruling on waiver was made by Judge Neville, the tone of what he said would indicate that inadvertent production would not constitute a waiver
 
 
 [6]
 Control Data Corp. v. IBM, Doc. No. 3-68 Civ. 312, at 4 (D.Minn. April 18, 1972)